IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

KATHLEEN BROWN, widow of
STEPHEN RANDOPLH BROWN,

     Plaintiff,

v.                                              Case No.: 3:10-cv-00411

MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,

     Defendant.

## MEMORANDUM OPINION

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 13 and 17). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 12 and 14).

The Court has fully considered the evidence and the arguments of counsel. For the reasons set forth below, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I. Procedural History

Plaintiff's decedent, Stephen Randolph Brown (hereinafter "Claimant"), first filed applications for DIB and SSI on August 25, 2004, alleging that he had been disabled since May 31, 2004, due to pulmonary and musculoskeletal impairments and vision loss. (Tr. at 67, 164 and 171). The Social Security Administration (hereinafter "SSA") denied the claims initially and upon reconsideration. (Tr. at 65). Thereafter, Claimant requested an administrative hearing, which was conducted on October 19, 2006 by the Honorable William H. Gitlow, Administrative Law Judge. (*Id.*) By decision dated November 17, 2006, Judge Gitlow determined that Claimant was not disabled and, therefore, was not entitled to benefits. (Tr. at 65-75). Judge Gitlow's decision became the final decision of the Commissioner on May 2, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 9). Thereafter, Claimant appealed the Commissioner's decision to the United States District Court for the Southern District of West Virginia.[1] (*Id.*)

While awaiting word from the Appeals Council concerning his first set of applications, Claimant filed a second set of applications for DIB and SSI on March 8, 2007, again alleging a disability onset date of May 31, 2004. (*Id.*). These applications were denied initially and upon reconsideration. Thereafter, Claimant requested an administrative hearing, which was held on October 20, 2008 before the Honorable Andrew J. Chwalibog, Administrative Law Judge. (Tr. at 32-61). At the conclusion of the hearing, Judge Chwalibog arranged for Claimant to undergo an additional physical evaluation, so that his current residual functional capacity could be assessed. (Tr. at 61).

---

[1] On July 20, 2009, the District Judge found that substantial evidence supported the decision of the ALJ and dismissed Claimant's action. *See Brown v. Astrue,* 2009 WL 2215113 (S.D.W.Va.).

After completion of the additional evaluation, Judge Chwalibog held a supplemental hearing on February 4, 2009 for the purpose of obtaining updated vocational testimony. (Tr. at 23-31). By decision dated May 13, 2009, Judge Chwalibog determined that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 9-22). This decision became the final decision of the Commissioner on January 28, 2010 when the Appeals Council denied Claimant's request for review. Claimant timely filed the present action seeking judicial review of Judge Chwalibog's decision pursuant to 42 U.S.C. §405(g). (Docket No. 2). The Commissioner filed an Answer and a Transcript of Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 8, 9, 13 and 17). Consequently, the matter is ripe for resolution.

## II.     Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the

claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

In this particular case, Judge Chwalibog determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through March 31, 2011. (Tr. at 12, Finding No. 1). At the first step of the sequential evaluation, Judge

Chwalibog found that Claimant had not engaged in substantial gainful activity since November 18, 2006, the disability onset date for the purposes of Claimant's second set of applications. (Tr. at 12, Finding No. 2). Judge Chwalibog explained that although Claimant asserted a disability onset date of May 31, 2004, the unfavorable decision of Judge Gitlow was issued on November 17, 2006 and was upheld by the Appeals Council. Thus, Judge Chwalibog found Claimant's prior applications to be administratively final, making the current period of consideration to be November 18, 2006 (one day after the date of the unfavorable decision) through the date of Judge Chwalibog's decision. (Tr. at 10).

Turning to the second step of the evaluation, the ALJ determined that Claimant had the severe impairments of osteoarthritis of the neck and lumbar spine with chronic pain; chronic shortness of breath secondary to obstructive pulmonary disease (COPD), emphysema, allergic rhinitis, and a longstanding history of cigarette smoking; and peripheral neuropathy. (Tr. at 12-16, Finding No. 3). Nevertheless, under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (hereinafter the "Listings"). (Tr. at 16-17, Finding No. 4). The ALJ assessed Claimant's residual functional capacity (hereinafter "RFC") as the following:

> [C]laimant has the residual functional capacity that limits him to performing light level exertional work (Exhibits B23F and B24F). The claimant [can] sit for up to four hours out of an eight-hour day, three hours without interruption; stand for three hours out of an eight–hour day, one hour without interruption; and can walk for one hour out of an eight-hour day, no longer than thirty minutes without interruption, but would require a cane for long distances or on uneven surfaces for ambulation (Id.). The claimant can never operate foot controls, never stoop, kneel couch [sic], and crawl with the need to avoid all exposure to

> unprotected heights, (operation of) motor vehicles, and may have only occasional exposure to moving mechanical parts and vibrations. (Id.).

(Tr. at 17-22, Finding No. 5).

Relying upon the opinions of a vocational expert, who considered Claimant's past relevant work as a locksmith as it was performed by Claimant and is generally performed in the national economy, the ALJ found that Claimant was capable of returning to this employment position. (Tr. at 22, Finding No. 6). Accordingly, the ALJ determined that Claimant had not been under a disability, as defined in the Social Security Act, from November 18, 2006 through the date of the decision (May 13, 2009). (Tr. at 19, Finding No. 12).

## III. Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's

finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001). If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock v. Richardson, supra* at 775.

A careful review of the record reveals that the decision of the Commissioner is based upon an accurate application of the law and is supported by substantial evidence.

### IV. Claimant's Background

Claimant was fifty-three years old at the time of his first administrative hearing before Judge Chwalibog. (Tr. at 37). He finished high school and took some college classes. (Tr. at 38). In addition, Claimant completed basic and advanced locksmithing courses. (Tr. at 39). His prior work experience included die making and locksmithing. (Tr. at 39-40). Claimant was able to read and write in English and perform basic mathematics.

### V. Plaintiff's Challenges to the Commissioner's Decision

Kathleen Brown (hereinafter referred to as "Plaintiff"), who was substituted for her deceased husband as the plaintiff in this civil action, raises two challenges to the decision of the Commissioner. Both challenges concern the status of Claimant's vision between November 18, 2006 and April 2008, at which time Claimant underwent cataract surgery, a procedure which substantially improved his eyesight. First, Plaintiff alleges that Claimant's vision was so drastically impaired by the existence of cataracts that he was disabled during the 17 month period between Judge Gitlow's decision and Claimant's eye surgery. Plaintiff argues that despite having considerable evidence of Claimant's visual disability, Judge Chwalibog failed to award benefits for that period.

Plaintiff surmised that Judge Chwalibog erroneously concentrated on the improvement in Claimant's vision that existed at the time of the administrative hearing and simply overlooked the closed period of disability. (Pl. Br. at 12-15). Next, Plaintiff contends that the ALJ mistakenly determined that Claimant could return to his prior employment as a locksmith, a finding which applied to the entire period of claimed disability, although the corrective surgery did not occur until April 2008. According to Plaintiff, Claimant's eyesight was so poor prior to the surgical correction that he could not have worked as a locksmith. (Pl. Br. at 15-16). Plaintiff implicitly concedes that after the procedure, Claimant was visually capable of performing locksmithing duties.

In response, the Commissioner argues that on November 17, 2006, Judge Gitlow found Claimant's visual impairment to be "mild." Consequently, in order to succeed on her claims, Plaintiff must demonstrate a rapid deterioration in Claimant's eyesight between November 18, 2006 and April 2007 (one year before corrective surgery). The Commissioner further emphasizes that Plaintiff must establish that Claimant was incapable of performing any substantial gainful activity for a minimum of twelve continuous months in order to qualify for benefits. (Def. Br. at 1-2). The Commissioner argues that the medical records do not support a precipitous decline in Claimant's vision or the existence of a disability that persisted for a year or more. Accordingly, the medical record substantially supports Judge Chwalibog's decision. (*Id.*).

## VI. Relevant Medical Information

Although the Court has reviewed all of the evidence of record, including the medical evidence, only information pertaining to Claimant's vision will be discussed herein. Neither party raises evidence of significant changes in relation to Claimant's other alleged impairments.

On January 4, 2005, Dr. Joseph LoCascio, a local ophthalmologist, performed an examination of Claimant's vision, apparently at the request of Disability Determination Section (hereinafter "DDS").[2] Dr. LoCascio found that Claimant's near vision in the left eye was 20/70 without correction and 20/20 with correction and in the right eye was 20/400 without correction and 20/30 with correction. He diagnosed Claimant with cataracts and recommended corrective surgery within 30 days. He noted that Claimant had a "huge myopic shift over 2 years" and would need new glasses, but could wait until after the surgery since the prescription would change again.

At the administrative hearing before Judge Gitlow on October 19, 2006,[3] Claimant testified that his eyesight had continued to decline; however, he had not undergone the recommended cataract removal, because his medical card required his family doctor to refer him for the surgery, and he did not have a family doctor at that time. Claimant alleged that his poor vision precluded him from performing his prior relevant work as a locksmith.

In his administrative decision, Judge Gitlow noted that the medical evidence of Claimant's visual impairment documented only a "mild vision loss" with correction. (Tr. at 68). However, Judge Gitlow gave Claimant the benefit of the doubt and found his visual impairment to be severe. (*Id.*) When determining Claimant's RFC, Judge Gitlow included a functional limitation based upon Claimant's reduced visual acuity. (Tr. at 69). Relying upon the testimony of a vocational expert, Judge Gitlow found that Claimant was unable to perform his past relevant work as a locksmith, but could

---

[2] Dr. LoCascio's 2005 records are contained in *Brown v. Astrue,* Case No. 3:07-cv-00418, filed in the United States District Court for the Southern District of West Virginia at Document No. 11-3. They are also identified as Exhibit 6F in the Transcript of Proceedings (Docket No. 11).

[3] The transcript of the hearing is found in *Brown v. Astrue,* Case No. 3:07-cv-00418, filed in the United States District Court for the Southern District of West Virginia at Document No. 11-4, pages 216-257.

- 9 -

perform other light and sedentary exertional work, including hand packer, night guard, and assembler. (Tr. at 73-74).

The first notation in the medical records—after Judge Gitlow's decision—regarding Claimant's eyesight was made by a health care provider at the Ebenezer Medical Outreach on March 7, 2007. (Tr. at 292-293). According to this record, Claimant complained that his vision was getting progressively worse over the years. The health care provider recommended an evaluation by an ophthalmologist. (*Id.*)

On March 15, 2007, Claimant completed paperwork relating to the applications presently at issue. The field office interviewer documented that Claimant was wearing thin lens glasses and had to position his face very close to the paper to sign his name. (Tr. at 195). On March 27, 2007, Claimant completed additional paperwork detailing his daily activities and limitations. (Tr. at 215-222). Claimant indicated that he lived with his wife and granddaughter, but was usually alone during the day, as his wife worked and his granddaughter attended school. He described his day as starting around 5:30 a.m. He made "bacon & eggs for breakfast" and simple lunches; he vacuumed, dusted, and picked up around the house; he cut the grass in the summer; drove a car; went to church; walked to the bus stop to pick up his granddaughter; and watched her ride her bike and play. (*Id.*).

On April 18, 2007, Dr. Kip Beard, a physician at Tri-State Occupational Medicine, examined Claimant at the request of Disability Determination Services ("DDS"). Although Claimant did not report any particular problems with his vision, Dr. Beard tested Claimant's visual acuity, which was recorded at 20/200 bilaterally without corrective lenses. (Tr. at 308-313). Dr. Beard did not include a diagnosis of impaired vision in his assessment.

The following day, Claimant saw clinical psychologist Diane Mufson, M.A. for a mental status examination at the request of DDS.  Ms. Mufson documented that Claimant reported vision problems related to cataracts that had been present for three to four years.  (Tr. at 320).  Claimant told Ms. Mufson that he helped with light household chores, occasionally cooked, cared for his own grooming, and did minimal driving, although his vision did affect his ability to do some of these tasks.  (Tr. at 322).  Nonetheless, Claimant also reported that he continued to work on antique locks, although this was "a slow process due to vision problems."  (*Id.*).

On May 24, 2007,  Dr.  Browning examined Claimant's eyes at the request of DDS. (Tr. at 341).  He documented that without correction, Claimant's near vision (at 16 inches) was 20/400 in both eyes.  With correction, Claimant's near vision was 20/100 in his right eye and 20/50-1 in his left eye.  Dr. Browning diagnosed cataracts, indicating that Claimant needed surgery to improve his vision.  (*Id.*).

On June 1, 2007, Dr. Fulvio Franyutti, an agency consultant, completed a Physical Residual Functional Capacity Assessment.  (Tr. at 343-350).  He commented that Claimant had cataracts and his visual acuity without correction was 20/200, although he did not mark the functional limitations attendant to Claimant's visual impairment.  Accordingly, the SSA asked Dr. Franyutti to supplement his assessment and specifically address the visual limitations.  Dr. Franyutti provided his additional opinions on June 6, 2007, indicating that Claimant was limited in far and near acuity, but had no limitations in depth perception, accommodation, color vision, or field of vision. (Tr. at 353).

Claimant again supplemented his paperwork with the SSA on June 20, 2007, indicating that his vision was "worse." (Tr. at 230).  On July 24, 2007, he added that his

vision now prevented him from driving at night or from going out after dark without someone to assist him. (Tr. at 244-251). Claimant reiterated in a later filing on October 11, 2007 that he was driving less frequently. (Tr. at 258).

Dr. Rogelio Lim completed a Physical Residual Functional Capacity Assessment at the request of the SSA on September 21, 2007. (Tr. at 372-380). Dr. Lim acknowledged the results of Claimant's most recent eye examination, but did not opine that Claimant's vision resulted in any particular limitations. (*Id.*) According to the SSA claim file, on November 26, 2007, Claimant reported that he was scheduled to undergo cataract surgery by Dr. LoCascio on his right eye on December 5, 2007 and on his left eye on December 17, 2007.[4] (Tr. at 265).

On January 25, 2008, Claimant presented to Dr. Ronald Greer of University Physicians & Surgeons for "management of multiple, complex medical problems." (Tr. at 420-423). Dr. Greer reviewed with Claimant the history of his present illnesses. His cataracts were not listed in the active problem list, and Claimant denied vision problems when asked by the physician during the review of symptoms assessment. (Tr. at 421). On a return visit on February 29, 2008, Claimant again made no complaint about visual problems, and cataracts were not listed in the "active problem" list. (Tr. at 418).

On October 20, 2008, at the first administrative hearing on the present applications for benefits, Claimant testified that he had cataract removal and intraocular lens implantation "six months ago" by Dr. LoCascio. (Tr. at 43-44). He stated that his vision went from 20/400 to 20/30 "in the matter of an hour." (Tr. at 44).

---

[4] The records from Ebenezer Medical Outreach also document a December 5, 2007 appointment; however, that appointment is with Dr. Lavery, another ophthalmologist in Huntington who performs cataract surgery. (Tr. at 413).

## VII. <u>Analysis</u>

Plaintiff's challenges to the Commissioner's decision focus entirely upon a determination of the status of Claimant's visual impairment at various points in time between November 18, 2006 and April 2008.[5] However, the more germane query is whether Plaintiff demonstrated that Claimant, considering the totality of his impairments, was unable to engage in substantial gainful activity; bearing in mind that Claimant's *disability*, not simply his impairment, must have persisted for a continuous period of at least twelve months between November 18, 2007 and May 13, 2009, the date of Judge Chwalibog's decision. 42 U.S.C. § 423(d)(1)(A).

At the time of the final determination of Claimant's initial applications for DIB and SSI, Claimant had produced medical evidence to the SSA, which substantiated that his visual acuity was impaired, with his near vision in the left eye measuring 20/70 without correction and 20/20 with correction and in the right eye measuring 20/400 without correction and 20/30 with correction. Judge Gitlow was fully aware of Claimant's diminished eyesight and included in his RFC a functional limitation specifically intended to account for Claimant's visual impairment; that being, that Claimant should "avoid work requiring very fine visual acuity." Even taking this limitation into consideration, the vocational expert concluded that there were jobs available in significant numbers in the national and regional economy at the light and

---

[5] The date of Claimant's cataract surgery is unclear. The records in evidence suggest that the surgery was completed in December 2007. For example, the Ebenezer Outreach records document an appointment with an ophthalmologist on December 5, 2007, and Claimant reported to the SSA that he had cataract surgery scheduled on that date. In addition, the records from Dr. Greer's office document that Claimant had no visual problems on January 25, 2008. However, Claimant's testified at the October 2008 administrative hearing that he had cataract surgery approximately six months earlier, which was April 2008. Claimant never submitted the surgical records, and the ALJ never requested them. Accordingly, for the purpose of this opinion, the Court will assume the surgery occurred in April 2008. It is undisputed that immediately after cataract surgery, Claimant's eyesight was restored and he no longer had a significant visual impairment.

sedentary exertional level that could be performed by Claimant. Judge Gitlow adopted the opinions of the vocational expert and found Claimant was not disabled. That decision was ultimately affirmed by the United States District Court for the Southern District of West Virginia.

The records pertaining to Claimant's diminished eyesight and its resulting functional limitation are minimal for the period beginning November 18, 2006 and extending through April 2007.[6] A record from the Ebenezer Medical Outreach on March 7, 2007 documented that Claimant complained about his eyesight to a health care provider at Ebenezer Outreach for the first time, and the health care provider recommended an eye examination. However, during that same month, Claimant reported to the SSA that he was able to perform all routine activities of daily living, including grooming, caring for his cat, cooking, cleaning the house, vacuuming, cutting grass, walking around the neighborhood, and driving. (Tr. at 215-227). This report, which was supplied voluntarily by Claimant and provided a contemporaneous snapshot of Claimant's activities at that time, constitutes reliable and substantial evidence that Claimant's ability to function during the first four months after Judge Gitlow's decision was not any more limited than his functioning prior to that determination.

Likewise, when Claimant was examined by Dr. Beard on April 18, 2007, specifically for purposes of processing his second round of disability applications, Claimant did not report to Dr. Beard that his eyesight played any major role in his ability to work. (Tr. at 308-313). Claimant neither complained that his visual acuity had precipitously declined in the recent past, nor attributed any particular limitation to

---

[6] Because the Court is using April 2008 as the date of corrective surgery, Plaintiff must establish that a decline in Claimant's eyesight rendered him disabled by the end of April 2007, at the latest, in order to fulfill the continuous twelve month requirement of the Social Security Act.

his vision. Instead, he described his disability-related problems as coronary problems, back and neck pain, shortness of breath, and neuropathy. His visual acuity at that time was recorded as 20/200 bilaterally **without** corrective lenses. Despite his visual impairment, Claimant admitted to Dr. Beard that he used a push mower to cut the grass, which again suggests that Claimant's vision had not significantly worsened by this point on the time line. Similarly, the following day, he told clinical psychologist Diane Mufson that he cared for his own hygiene, continued to drive, worked on antique locks, camped, and enjoyed "watching" racing and football. He also attended church once a week. (Tr. at 322). It was not until June 2007 that Claimant began to complain that his vision was growing worse. By the end of July 2007, Claimant reported experiencing significant difficulties in maneuvering at night and after dark; thereby, resulting in a greater limitation of his ability to function.

Claimant's contention that the ALJ should have more fully addressed the medical findings pertaining to Claimant's visual impairment is without merit. An ALJ is not required to comment on every piece of evidence contained in the record, but need only minimally articulate his reasoning so that he creates a bridge between his decision and the evidence. *Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir. 2000). Dr. Beard's examination was the only medical record pertinent to Claimant's eyesight that was prepared during the relevant time frame, and that record did not establish any considerable change in Claimant's ability to perform basic job-related activities from the time of Judge Gitlow's decision. The objective medical evidence substantiated only that Claimant had cataracts for an extended period of time that caused a *progressive* decline in his ability to see and, thus, impaired his function. However, the evidence does not reasonably support the conclusion that, for a continuous twelve month period prior to his cataract surgery,

Claimant was unable to perform any of the jobs identified by Judge Gitlow in his written decision.

Plaintiff also takes issue with the ALJ's determination that Claimant could perform his prior relevant work as a locksmith, arguing that the ALJ erred in making this finding, because Claimant clearly was unable to perform the duties of that job before his cataract surgery. Plaintiff adds that Judge Chwalibog improperly terminated the sequential evaluation at the fourth step and, as a result, failed to supply evidence that other jobs existed in the national economy that could have been performed by Claimant during the period between Judge Gitlow's decision and Claimant's cataract surgery. Inherent in this argument is Plaintiff's suggestion that an ALJ is required to make findings that reflect differing levels of RFC at points in time when a claimant allegedly experienced a change in functional limitation. Not surprisingly, Plaintiff offers no legal support for this contention.

Contrary to Claimant's suggestion, an ALJ is not required to retrospectively construct a provisional RFC for a claimant at various points in time and supply vocational evidence as to jobs befitting the makeshift RFC. Furthermore, it is not enough for a claimant to demonstrate that a physical or mental change in the past temporarily affected the claimant's RFC. Instead, the claimant must present evidence that the physical or mental change caused the claimant to become disabled and the disability persisted for at least twelve months. This burden of proof always rests with the plaintiff. In this case, Plaintiff simply has not carried her burden of proof.

Here, Judge Chwalibog started his assessment with a finding that Claimant was not disabled as of November 17, 2006, even when considering his visual impairment. Therefore, when determining whether Claimant was disabled during the previously

unadjudicated period beginning the day after Judge Gitlow's opinion, Judge Chwalibog's duty was to consider the prior findings as evidence and assign them the appropriate weight in light of the relevant facts and circumstances. *Albright v. Commissioner,* 174 F.3d 473 (4th Cir. 1999). In considering the weight to assign to Judge Gitlow's findings, Judge Chwalibog was required to assess factors such whether the fact on which the prior finding was based was subject to change with the passage of time; the likelihood of such a change, considering the length of the time that had elapsed; and the extent to which evidence not previously considered provided a basis for making a different finding. *Id.* Judge Chwalibog indisputably fulfilled this duty, explicitly considering the prior findings and discussing the weight he assigned to them. (Tr. at 20). As Judge Chwalibog explained, the medical evidence substantiated an improvement in Claimant's vision and a worsening in his peripheral neuropathy; accordingly, Judge Chwalibog acknowledged these changes in constructing Claimant's RFC. The Court finds that the conclusions reached by Judge Chwalibog were supported by substantial evidence. The record simply does not contain sufficient evidence to establish a closed period of disability. Therefore, having reviewed the entire record in this case and having thoroughly considered the ALJ's decision and the arguments of the parties, the Court finds that the ALJ's determination that Claimant was not disabled during the relevant time frame was supported by substantial evidence.

## VIII. Conclusion

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:** May 6, 2011.

Cheryl A. Eifert
United States Magistrate Judge